## READING CO. v. HALDEMAN.

Circuit Court of Appeals, Third Circuit.
June 7, 1927.

No. 3592.

1. **Master and servant** ⬤137(4)—**Employee in congested railroad yards must rely on himself for his protection, which cannot be afforded by system of warnings.**

An employee working in railroad yards, having numerous tracks, on which engines are being constantly backed, and where by reason of the noise from escaping steam and the uncertain movements of engines no system of warning is used, or could be devised, which would afford protection from danger, must rely on himself for his protection.

2. **Master and servant** ⬤137(4)—**Railroad company held not liable for death of employee killed in yards.**

A railroad company *held* not chargeable with negligence, nor liable for death of an employee working in its yards, in which were numerous tracks, who was killed in the daytime by stepping immediately in front of the tender of an engine being backed down a track, and which he could have seen approaching for 400 or 500 feet.

3. **Master and servant** ⬤137(2)—**Railroad company held not negligent in failing to use safeguards not used by other railroads.**

In an action against a railroad company for death of an employee, opinions of witnesses that a system of warnings could and should

have been employed *held* not sufficient to charge defendant with negligence in failing to use them, in the absence of evidence that they were actually used by other railroads.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Action at law by Lucinda Haldeman, administratrix, against the Reading Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Edward L. Katzenbach and George Gildea, both of Trenton, N. J., for plaintiff in error.

Charles A. Ludlow and Ralph W. Botham, both of New York City, for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case it appears that Reading Company, the defendant railroad, had a yard at Tamaqua, Pa., where its engines at the end of their runs were hostled, oiled, refueled, inspected, and, if necessary, received minor repairs. The yard branched off by switches into several parallel tracks, running approximately north and south, and all east of the main through track, which skirted the west side of the yard. The most easterly track, which was also used as a running track, was called the coal dock track, from the coal bins adjoining it. To the west of this track was the "dirty" or receiving track, where entering engines were received. Next was the "clean" track, where cleaned engines were placed; then came the wreck train track; next the caboose track; and next siding tracks, adjoining one of the main line tracks, which is called No. 4. Fred Haldeman, the decedent, had been employed in this yard for a number of years; his duties being to oil, inspect, and make light repairs. The engines were usually backed tank first into the yard, and there was no custom to in any way signal their coming, and, while it was customary when engines were backed to have a trainman on the rear of the engine until it crossed a street at the head of the yard, no such lookout was kept after the street was crossed. The yard tracks were in constant use; the proof being that the entering engines averaged more than one every 10 minutes, and that the noise was such that it was difficult, if not, indeed, impossible, to hear.

The plaintiff's proofs show that about the middle of an afternoon Haldeman was coming down along the easterly side of the "dirty" track, evidently intending to go to his shanty or toolhouse, which was on the east side of the coal dock track. As a pusher engine at the rear of a freight train going north passed Haldeman, its engineer and Haldeman saluted each other. While passing Haldeman, the engineer saw an engine backing down the coal track, and "after Fred [Haldeman] saluted me, he only took—well, he might have taken—three or four steps; he stepped to go over the track, and was hit by the tank." His testimony describing the accident was as follows:

"Q. Mr. Ackerman, when you saw Mr. Haldeman step on the track where he was struck, how far away was the tank of the locomotive which struck him when he stepped on the track; that is, how far was the tank away from him when he stepped on the track? A. He stepped right in front of it.

"Q. How far away was it? A. Only a step.

"Q. How fast was it coming—do you know? A. No, sir; I could not judge the speed. We were going in the opposite direction, and you cannot judge speed when going in an opposite direction.

"Q. Do you mean to tell us he was struck just as soon as he stepped on the track? A. Yes; this tank was coming right aside of him when he made the step.

"Q. He was looking towards you, when he stepped on the track, wasn't he? A. No; he was walking and looking south.

"Q. How long before that had he saluted you? A. Two or three steps.

"Q. Did he salute you or Mr. Berry first? A. I do not know which one he saluted first.

"Q. Did you see Mr. Berry salute him or not? A. No, sir; I did not look back.

"Q. Did he look towards you when you saluted him? A. Yes.

"Q. And then took a couple of steps and stepped on the track? A. Yes.

"Q. And the second that he stepped on the track, he was struck with this tank? A. Yes.

"Q. You did not see him look in the direction of the tank before he stepped on the track? A. No, sir.

"Q. You did not see him look north at all? A. No, sir."

Another witness called by the plaintiff was Berry, an engineer on the second pusher engine, who testified to the same effect as Ackerman, saying Haldeman also saluted him. His testimony was:

"Q. And as your train kept going on you saw him going down the 'dirty' track after he saluted you? A. Yes.

"Q. Did you notice what he did with respect to his eyes or face, if he did anything? A. He put his hand up. I do not know

whether he took a cigarette out of his mouth, or got dirt in his eyes.

"Q. He made the motion, you say, of holding his hand up to his eyes? A. I was pretty far away from him then. I could not say that.

"Q. Did you say that he put his right hand up to his face, or turned it over like to his eye? A. I could not say whether it was his eye or not. He may have been pulling a cigarette out of his mouth.

"Q. But you saw him make that motion you have described of putting the right hand up towards the eye? A. Yes.

"Q. And then did you see him walk towards the dock track? A. Yes.

"Q. And is the dock track the track immediately in front of his office? A. Yes. * * *

"Q. Now, did you see him step onto the running track? A. Yes.

"Q. And what occurred? A. He got knocked down with the tank.

"Q. And which part of the tank struck him? A. Well, the way it looked to me, it looked as though it struck him close to the drawbar, and he was thrown back from the track. * * *

"Q. How far away from Mr. Haldeman was the tank which struck him, when he stepped on the track? A. I judge he made two steps. He made a step over the rail, and was making the second step when he got hit. * * *

"Q. Now, from there looking north from the point where Mr. Haldeman was struck is the track straight or not? A. It is not straight, but there is a very little bend in it.

"Q. How far could you see a locomotive coming down? A. You can see clean up to the top of the hill.

"Q. How far is that? A. Well, I dare say—let me see—from the top of that hill is about 400 or 500 feet.

"Q. And standing in the position where Mr. Haldeman was standing in when struck, he could have seen a locomotive coming for a distance of 400 or 500 feet? A. You could see the locomotive coming from the street crossing.

"Q. How far is that? A. Seven hundred feet, because you can see from this track here all the way up to the track crossing; that is, if there is no other engine in between to block your view."

[1, 2] It will thus be seen that the work on which the decedent was engaged was one of peril; that the noise incident to escaping steam in such yards, the uncertain movement of engines, the fact that no system of warnings has been, or indeed could be, devised by which danger could be avoided, have made this court hold to the reasonable rule that, as said by it in Connelley v. Pennsylvania, 201 F. 54, 47 L. R. A. (N. S.) 867 (cited by Supreme Court in Chesapeake v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914), "from the nature of such employment, the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them. And such has been the reasonable holding of the law." Seeing, then, that no negligence has been shown on the part of the railroad in failing to have a warning system, and in view of the evidence shown by the plaintiff's case that the deceased stepped on the coal dock track immediately in front of an engine coming on a track where, if he had looked, he could have seen its approach for 400 or 500 feet, we are constrained to hold the court should have given binding instructions for the defendant.

[3] In so holding we have not overlooked the fact that the trial judge admitted testimony of witnesses that good railroading required the railroad to place a man on the tender of a locomotive when backed in this engine yard. This testimony was received on the strength of certain general statements in the opinion in Pittsburgh, etc., Railroad v. Lamphere (C. C. A.) 137 F. 20. But these statements must be read in connection with the facts and the question there involved. An examination of the files in that case discloses these facts: A brakeman was required by his duty to pass over the roof of a freight train, and was struck by a tunnel of whose existence he did not know, and which had no telltales. In this situation a witness, who was a civil engineer, who had had experience in the construction of railroads, had served for many years as division engineer of a large railroad system, and knew of the practices on other large railroad systems, was refused permission to give his own opinion as to whether, "Are or are not telltales necessary for the protection of employees of a railroad, where a bridge is not high enough to admit the passage of a man standing on top of an ordinary box car?" but was allowed, after proving his wide knowledge of railroad systems as above, to testify that "a telltale or whiplash [was] a usual or ordinary appliance in use on well-regulated railroads for the purpose of giving the warning of low overhead bridges, or other obstructions, to employees."

The testimony which the judge in the case now before us received was of the character which the trial judge in the Lamphere Case ruled out, and was not as to the actual practice of other railroad systems, which the trial judge in the Lamphere Case admitted, and

this court affirmed. The witness whose testimony is here involved was testifying to his own personal opinion, but was not testifying to the general practice in other railroads.

Adhering to the line of decisions unbrokenly followed in this circuit pertaining to the risks of such yards being ones that, except when guarded against in a manner established by custom, are assumed by those who work therein, and "that the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them," the decision below must be reversed, and the cause remanded to the court below for further procedure.