PENNSYLVANIA RAILROAD COMPANY *v.* JOHNSON, ADMINISTRATRIX.

[No. 13,362. Filed December 19, 1929. Rehearing denied April 2, 1930. Transfer denied May 20, 1930.]

*Leonard, Rose & Zollars,* for appellant.
*Henslee & McKown* and *H. W. Mountz,* for appellee.

LOCKYEAR, J.—This action was brought by appellee against appellant to recover ·damages for the death of appellee's decedent, at Clark Station in the State of Indiana, while he was employed by appellant as head brakeman upon one of its trains running from the city of Fort Wayne, in the State of Indiana, to the city of Chicago, in the State of Illinois. Appellant, at the time the deceased was killed, operated a double track railroad running westwardly through the town of Clark in the county of Lake, State of Indiana.

The tracks of appellant company ran through the town of Clark in a northwestwardly and southeasterly direction, the north track being used by west-bound trains and the south track being used by east-bound trains. Appellant, at said point, maintained a pumping station and water plug for the purpose of supplying locomotives with water, one of which water plugs was located immediately north of the west-bound main track, and the other was located south of the east-bound track. The pumping station was located immediately south of the east-bound track, and the water plugs were in line with it.

Appellee's decedent had been employed for a number of years as a brakeman in the service of appellant. During the year 1922, he had made 67 round trips over this route, and had frequently stopped at this water plug when water was taken. On the day in question, and for some time prior thereto, he was employed as head brakeman, and, as such, rode upon the locomotive of the train, and it was his duty at Clark to uncouple the engine from the train, so that the engine could move forward to the water plug and take water. It was also his duty during the time that the locomotive was being supplied with water to look over and inspect the train and to couple the locomotive onto the train after it had taken water. It was also the duty of appellee's decedent as head brakeman to relay signals from the rear end of the train to the engineer on the locomotive, as well as to observe conditions in connection with the train in starting from the station. On the day in question, the train upon which appellee's decedent was acting as head brakeman arrived at Clark Station about 6 o'clock in the evening, and stopped at a point some 25 or 30 car lengths east of the water plug, this being necessary to prevent the fouling of the interlocking plant maintained at that point. Immediately after the train stopped, appellee's

decedent uncoupled the engine of the train, and the locomotive was moved up to the water plug, where the fireman took water, after which the locomotive was backed eastward, and appellee's decedent coupled the same onto the train and boarded the engine. East of the point where the train was stopped, the tracks of appellant curved to the northeast. Immediately after the coupling up of the engine to the train, the train was started and proceeded slowly westward past the water plug, until it reached a point from three to four miles west of Clark Station, when it was discovered that appellee's decedent was not upon the engine. Subsequently, a member of a work train that was standing upon a siding immediately back of the pumphouse at Clark Station went into the pumphouse and discovered appellee's decedent sitting in a chair immediately inside the door with the side of his face covered with blood and otherwise injured, from which injuries appellee's decedent died shortly afterward. It is alleged that the injuries from which appellee's decedent died were sustained by coming in contact with the water plug.

The case was tried upon an amended complaint, to which appellant filed an answer in general denial.

The negligence of appellant, set out in the complaint as alleged, is: That, at the time complained of, appellant carelessly and negligently constructed and maintained a water spout or structure by the side of and just north of the west-bound track in such close and dangerous proximity to said track that it was a constant menace and a source of danger to the life and limb of its employees who were required to work at and about said place; that it carelessly and negligently failed and neglected to provide proper and suitable clearance between said track and said water plug or structure, that it carelessly and negligently and unlawfully maintained said water plug at a closer distance than was reasonable

and proper, having regard for the fact that it was necessary for employees to work on the side of said train while it was in motion, and also to look back from the engine thereof for signals from the rear end of said train, as was necessary in the performance of their duties as brakemen and employees of said railroad.

Appellee further says that her decedent did not know, nor did he have equal means or opportunity of knowing, the dangers and conditions as herein set out; but, as a direct and proximate result of the carelessness and negligence of appellant as herein set forth, and without any fault or negligence on the part of appellee's decedent, he was thrown, jerked and hurled against said water spout or structure and to the ground in such a manner that his arms were broken and crushed, his limbs were fractured, his back was broken, and his ribs crushed, and otherwise so injured that he died as a result of his injuries, approximately three days thereafter.

The cause was submitted to the jury, and the jury rendered a verdict in favor of appellee in the sum of $7,500.

Appellant filed a motion for a new trial on the grounds that the verdict is contrary to law and is not sustained by sufficient evidence, and the damages awarded are excessive. Appellant, in its motion for a new trial, also complains of the giving and refusing of certain instructions and the admission of certain evidence.

It is contended by appellant in this case that there is no evidence, either direct or circumstantial, upon which the verdict of the jury can reasonably be predicated as to how Johnson met his death, and that the verdict of the jury is merely a conjecture and a speculation. The evidence on that point, briefly stated, is substantially as follows:

Dennis H. Monohan, engineer, testified: "I stopped at Clark's Station 2 or 3 car lengths east of the sema-

phore. When we stopped for water, our instructions were to clear the interlocking plant. This would require us to stop a little distance from the semaphore. When we stopped, Johnson cut off the engine, uncoupled the engine and disconnected the air hose. It was Johnson's duty as head brakeman to ride the engine. After the engine was cut off, we pulled up to the plug for the purpose of taking water, and after we had taken water, we backed up to the train, and it was Johnson's duty during the time we took water to inspect the train and see if the brake-beams were down and, after having made his inspection, it was his duty to return to the front end of the train. When we backed down, he made the coupling and connected the air hose, then I called the flagman by the whistle. After the air hose was connected, I had to pump the air pressure on the engine so that I could release the brake. After Johnson coupled up the engine, he got back into it. As engineer, I was on the right side of the engine. That was the north side going west. After I called the flagman and started the train, I was informed that the train was all coming. The signal is communicated to me by raising a lamp up and down. At night, they use a lantern and, in the daytime, a flag or hand. It is also the duty of the head brakeman to get the signal, and if I am otherwise occupied to pass it to me. At the time the caboose passed the signal tower, we got a 'highball.' The tower did not represent the station point. After Johnson got on the train and after having connected up the engine and air hose, he stood on the deck of the engine or gangway about half between the engine and the tender. I don't remember whether he had a lantern or not at this time. He was there quite a little time. He helped the fireman shake the grates just as soon as he connected the engine and air hose. He got hold of the shaker bar. That was done while I

was pumping up the air and, as we started, he was on the deck of the engine. The first I knew he was missing was when the fireman called my attention, when we were near Indiana Harbor. His lantern was hanging on the bulkhead door on the front end of the tank. There is a compartment there for tools, etc. The lantern was hanging on the bulkhead right behind me on the north side of the engine. I saw Johnson after he had shaken the grates and taken his position in the gangway. I had already started the train and it had progressed four or five car lengths and I saw him answer the signal from the cab when the flagman got on. Johnson answered it right after the grates had been shaken and just as we were starting, after we had gone eight or ten car lengths."

Rollie Stoner testified: "When we stopped, Johnson got off the engine and cut off from the train. I went back over the coal pile to take water. After we had taken water, and filled the tank, I put the plug back into position and it latched itself. Johnson coupled the engine to the train and, after he had made the coupling, he crawled upon the engine. He got up onto the gangway. He was there when the engine started and pulled out. The last time I saw him was when he helped me shake the grates before we started and while the engine was pumping up the air. After he had shaken the grates before starting, it was then he took his position in the gangway. I was sitting on the south side on the seat and I did not see him any more after he had helped me shake the grates and the train started. We had gone three or four miles before we missed him. We found his lantern hanging on the north side of the engine."

L. R. Lehman, brakeman, testified: "It was my duty to help the conductor make up the trains at the yards, watch engine signals and watch movements of trains, hot boxes, anything that happens to be wrong. Rode on the rear end of the train, rear platform of caboose,

passing around curves, around and through cities. The head brakeman would be on the engine looking through the cab window or the gangway. Some of them ride on the cars when the weather will permit. I was in the cabin car the day this train passed Clark. The train stopped and I started walking ahead inspecting. I was on the north side. I saw Johnson at Clark. I met him about 30 cars from the caboose. He was coming back on the same side inspecting the train. That is the brakeman's duty as well as the conductor's. When I met him, I gave him his lantern and asked him how the train was at the end and he said all right. I did not get back to the caboose before the train started. Then the engineer called in the flag. Plybon was flagging. He was the conductor on the train. After the flag was called in, the train started to move. I was about 15 cars from the caboose when it started to move and I got on the car when it passed the tower. Mr. Plybon was standing on the steps with a message for the operator. He remained in that position until we got to the telegraph office, he threw the message off. I did not see Johnson after I met him there inspecting the train. I stood on the south side of the caboose and Plybon on the north side."

Charles C. Plybon, conductor, testified: "We had 63 cars on the train not including the caboose. I received a signal from the engineer, he called in the flag. I came in and gave the signal to go ahead. I did not get on the caboose until after the train started. After the train started, I got on the rear end of the caboose and gave the signal all right. I did not do anything after that until we got to the telegraph station, then I gave the operator a signal I had a message for him. I signaled with a lantern and he answered with his hand. I threw the message off. It was not my duty to give signal then to show clearance from that station. The water plug at which we took water that night was west of the telegraph

station some 15 or 18 car lengths. I first learned that Johnson had been injured at the Coalhour yards about 14 miles from Clark."

Jess Hay, conductor, testified: "On the evening Johnson was injured, I was not there when the train came in from the east. I got there when it was leaving. I put my train on the stock track located on the south side of track No. 2. After the train had left, I saw Johnson in the pumphouse, he was sitting on a chair. He had a hole on the left side of his head near the temple. Saw him ten or fifteen minutes after the train had left." Question: "What, if anything, did he say?" Answer: "Told me something hit him."

This action is brought under the federal Employers' Liability Act (45 USCA §§51-59), and, by that act, Congress took possession of the field of employers' liability to employees by rail, and all state laws upon that subject were superseded. *Mondou* v. *New York, etc., R. Co.* (1912), 223 U. S. 1, 55, 32 Sup. Ct. 169, 56 L. Ed. 327, 348, 38 L. R. A. (N. S.) 44, 1 N. C. C. A. 875; *Seaboard Airline Co.* v. *Horton* (1913), 233 U. S. 492, 501, 34 Sup. Ct. 635, 58 L. Ed. 1062, 1068, L. R. A. 1915C 1, Ann. Cas. 1915B 475, 8 N. C. C. A. 834. The rights and obligations of the plaintiff depend upon that act and applicable principles of common law as interpreted by the federal courts. The employer is liable for the injury and death resulting, in whole or in part, from the negligence specified in the act, and proof of such negligence is essential to recovery. The kind and amount of evidence required to establish it is not subject to the control of the several states. The court will examine the record, and if it is found that, as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed. *St. Louis, etc., R. Co.* v. *McWhirter* (1913), 229 U. S. 265, 277, 33

Sup. Ct. 858, 57 L. Ed. 1179, 1186; *New Orleans, etc., R. Co.* v. *Harris* (1918), 247 U. S. 367, 371, 38 Sup. Ct. 535, 62 L. Ed. 1167, 1171; *New Orleans, etc., R. Co.* v. *Scarlet* (1919), 249 U. S. 528, 39 Sup. Ct. 369, 63 L. Ed. 752.

The negligence of a defendant cannot be inferred from a presumption of care on the part of the person killed. A presumption in the performance of duty attends the defendant as well as the person killed; it must be overcome by direct evidence. One presumption cannot be built upon another. *Looney* v. *Metropolitan R. Co.* (1906), 200 U. S. 480, 26 Sup. Ct. 303, 50 L. Ed. 564; *Douglass* v. *Mitchell's Exr.* (1860), 35 Pa. 440; *Yarnell* v. *Kansas City, etc., R. Co.* (1893), 113 Mo. 570, 21 S. W. 1, 18 L. R. A. 599.

In the case of *Patton* v. *Texas & Pac. R. Co.* (1901), 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, where a fireman was injured on a broken step, Justice Brewer says: "The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence, also it is not sufficient for the employee to show that the employer may have been guilty of negligence, . . . the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer is the real cause, when there is no satisfactory foundation in the testimony for that conclusion."

In the case of *Chicago, etc., R. Co.* v. *Coogan* (1926), 271 U. S. 472, 46 Sup. Ct. 564, 70 Law Ed. 1042, where a brakeman was killed in attempting to couple the air hose in a train in the process of being

made up, at a point where the railroad company had negligently permitted an air pipe along the track to remain bent, it was held that the mere fact of the killing does not show that his foot was caught under the bent pipe, and the mere presence upon his shoe of a round mark discovered several days after the accident, with nothing to show when and how it was made, and with no care taken to preserve the shoe in the same condition as it was when the accident occurred, does not supply the hiatus in the proof so as to justify a judgment against the employer for the death under the federal Employers' Liability Act. In the case at bar, even if the jury was justified in finding that the decedent's death occurred in the manner charged in the complaint, we must still go further and find that the appellant was negligent in locating its water plug too close to the track.

Section 12965 Burns 1926 provides: "It shall hereafter be unlawful for any steam railroad carrier in this state engaged in operating a line of standard gauge railroad therein, or for any person or persons, association, municipal or private corporation, to build or maintain any structure of any kind or any existing railway bridge, or to alter or rebuild an existing structure of any kind, or any existing railway bridge along the line of any such railroad in this state, in which that part of any such structure or bridge nearest to the track shall be less than seven feet from the center thereof, without first obtaining permission of the railroad commission of Indiana so to do."

The undisputed evidence in this case is that the water plug in question was located seven feet five and one-half inches north of the center of the west-bound track, and that the cab of the engine was 10 feet wide at its widest point. Therefore, there was a space of two feet five and one-half inches clearance between the cab of the engine and the water plug.

The answer to the question as to the negligence of appellant is answered in the negative in two cases decided by this court, viz., *Cleveland, etc., R. Co.* v. *Haas, Admr.* (1905), 35 Ind. App. 626, 74 N. E. 1003; and *Baltimore, etc., R. Co.* v. *McOsker* (1909), 44 Ind. App. 255, 88 N. E. 950. Both opinions were written by Comstock, J., in which cases he has collected and digested a large number of cases showing that the great weight of authority in this and other states is to the effect that placing a necessary object seven feet from the center of the railroad track is not negligence, and in many cases a less distance has been held not to be negligence.

It is not necessary to again copy the holdings above referred to in this opinion; but suffice it to say that, in the case of *Baltimore, etc., R. Co.* v. *McOsker, supra,* the facts pertinent to the determination of this question were: There was a bridge 14 feet three and three-fourths inches wide in the clearance of the east end thereof; the decedent was injured when his head came in contact with a north post of said bridge at the east end, located seven feet three and one-fourth inches from the track; at the time of the injury, the decedent was leaning out of the north side of the gangway, looking toward the rear of the train; the outside measurement of the engine upon which the decedent was riding was nine feet 10 inches; the outside clearance between the outer edge of the gangway of said engine and said post was two feet four and one-fourth inches; the decedent had made 57 trips past the bridge, either 28 in the daytime and 29 in the nighttime or *vice versa;* the standard width of the bridges of other roads in the United States is 14 feet; some of them use wider engines than appellant used; the standard width of bridge of the kind in question is 14 feet, that is, 14 feet is the minimum width; the complaint did not allege nor does it show that decedent was directed by anyone to stand where he stood or to lean out of the engine; the

train was going west, and decedent was struck by the easterly north post of said bridge; the fireman testified that he saw decedent leaning out farther than he had ever seen anyone before; it also appeared that the track at this point was in a cut, and that, if one were able to see the rear of the train at all, it would be necessary to direct the vision through the opening made by the cut; appellee's decedent had safely passed over the bridge in question for several months prior to the accident, and other employees for years had done so without accident; there was nothing, therefore, in the experience of the decedent or in the history of the road, from which the accident could have been anticipated; the decedent was 21 years of age, in good health, in possession of all of his faculties, and of average intelligence; it was not to be anticipated that an intelligent or ordinarily prudent man would unnecessarily expose himself to imminent or apparent danger; against such possible conduct upon the part of the employees, the railroad company is not required to provide; the bridge was reasonably safe for conducting the business of the road, and this court held in that case there was no negligence.

As a final consideration in this case, we are bound to conclude, as a matter of law, that there were not sufficient facts proved to justify the conclusion that ■ Johnson met his death by coming in contact with the water plug. If he had fallen off the north side of the engine, he would have had to wait there by the track for a train of 63 cars to pass him and then have strength of body and mind sufficient to pass over the two tracks to the south side and into the pump house, 30 feet from where he was injured. He may have fainted, or he may have attempted to get off the engine and slipped and fell, or he may have been struck by some other object. There is as much reason to suppose that he got off the left-hand side of the engine as there is that he got off the

right-hand side, because there is no evidence either way.

As was stated in the case of *Werling, Admx.,* v. *New York, etc., R. Co.* (1929), 90 Ind. App. 26, 168 N. E. 42: "It is left purely in the realm of conjecture as to whether he stumbled and fell from the platform, or whether he tried to alight and get off the bridge, and in so doing missed his footing or his handhold."

In view of the fact that the water plug was located farther from the center of the track than the minimum distance required by statute, and whereas there is no showing that there was any unusual construction in the locomotive and the cars or the width thereof, and there is no showing that the roadbed was out of repair, so as to cause any sudden jerking or other motion that is not usual to a train that is being started, we hold that, under the undisputed facts of this case, appellant was not negligent, and that the court below erred in overruling appellant's motion for a new trial.

Judgment reversed.