## CAIN v. FORT WORTH & DENVER CITY RY. CO.

### No. 7459.

Circuit Court of Appeals, Fifth Circuit.
Jan. 10, 1935.

Rehearing Denied Feb. 28, 1935.

E. W. Napier, of Wichita Falls, Tex., for appellant.

F. B. Walker, of Fort Worth, Tex., and Luther Hoffman, of Wichita Falls, Tex., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

About 1:30 a. m. on December 7, 1932, J. W. Cain, employed by the Fort Worth & Denver City Railway Company as car inspector and repairer, was found dead in its Wichita Falls yards. When found, his body, with one leg severed from it, was lying close up to and outside of the east rail of track No. 2 of the top yards on which an

interstate train had been made up late the night before for leaving at 5 o'clock that morning. His lantern was found unlighted about halfway between tracks No. 2 and No. 3, ten or fifteen feet north of where he lay, and there were blood stains on the wheels of 18 cars south of that point toward Seventh street. No one saw him come to his death. Nothing was known of the manner in which or the time when he was killed. It was assumed, however, that he must have been in between or in front of cars standing on the track when a movement of the cars toward Seventh street occurred late that night between 10:30 and 11:50 p. m. The air hose was coupled between the first and second cars. Several others were also coupled.

Appellant, suing under the Federal Employers' Liability Act, section 51, tit. 45 USCA, stood on three grounds of negligence: (1) Moving the cars in question while the deceased was working on them; (2) failure to look out for him; (3) failure to give warning of the intention to move the cars. She alleged that Cain's duties that night required him to go between cars standing upon certain tracks, including track No. 2, for the purpose of inspecting for repairs and repairing them, and to couple the air hose; that it was customary and proper for the switching crew to refrain from moving cars requiring inspection without first ascertaining whether or not an inspector was working about them, and warning him that they were to be moved; that contrary to this established custom and proper practice, the switching crew did, on the night of December 6, 1932, move a cut of cars standing on the tracks, while plaintiff's husband was at work between them, causing them to run over and kill him.

The defenses were, general denial, contributory negligence, and assumed risk. Plaintiff tried the case on the theory that there was a custom and practice prevailing in the yards for the train crew, before moving cars on tracks, to look out for and warn inspectors who might be working on them. That Cain, when he was killed, was at his work of inspecting cars, relying on this custom and practice. It was her contention that members of the train crew knew that Cain was at work. that night somewhere in the top yards, going about the performance of his duties, and that to shove cars without notifying him that they were going to do so was negligence. She insisted that this custom and practice of warn-

ing inspectors was a part of the conditions of a safe place to work on which Cain was entitled to rely, and that he did not assume the risk of its being negligently departed from until he knew, or had reason to know, that it would be. She argued that for the same reason Cain's working on the cars without first notifying the train crew that he was could not be said to be contributory negligence.

Defendant did not claim that Cain was warned, nor did it deny that he must have been killed by cars shoved over or against him when he was on the track. It, however, emphatically and completely denied the assumptions, both of law and of fact, on which plaintiff based her theory of liability. This extended to denial (1) that Cain was at the time and place of his death in the performance and discharge of his duties; (2) that the train crew knew that he was engaged on or about track No. 2 in line of duty when the shoves, one of which must have caused his death, took place; (3) that there was any custom or rule requiring switching crews to conduct switching operations under the handicap of having to patrol the yards and tracks to locate inspectors before switching cars. It insisted that with the number of cars to be moved, more than 150 that night, it would be wholly impracticable, if not impossible, to conduct switching operations as plaintiff claims they should be and were ordinarily conducted. It asserted that on the contrary, the obligation was on the inspectors to look out for and keep out of the way of cars unless and until, by putting out blue lights or otherwise, they had given the train crew information that they were working on cars, and that since no signals or other notice of Cain's presence on track No. 2 were given to the switching crew, it could not have been negligence to finish making up the train there. It insisted, too, that for Cain to go to work on cars on that track while the train was being made up, as plaintiff assumes he was doing, without taking the precaution to insure himself against their movement, thus voluntarily putting himself in a place of great danger, was conduct on his part so wanting in care, and so directly the cause, as to be in law the sole proximate cause, of the injury.

Finally, it says that such proof as was made of the practice of inspectors to work upon and around cars while they were being switched and moved in making up trains was proof merely of a dangerous practice

affected with grave danger of injury, and that those inspectors who undertook to work on and around cars being made up into trains, without first notifying the train crews, voluntarily and deliberately assumed the risk of injury such practices entailed. It insisted finally that the state of the evidence was such as that no reasonable verdict could have been reached, because just how, when, and under what circumstances Cain came to his death was not proven, but left by the evidence entirely to speculation and conjecture. Kansas City R. Co. v. Jones, 276 U. S. 303, 48 S. Ct. 308, 72 L. Ed. 583; Atchison Ry. v. Saxon, 284 U. S. 458, 52 S. Ct. 229, 76 L. Ed. 397; Atchison Ry. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. Ed. 896; New York Ry. v. Ambrose, 280 U. S. 489, 50 S. Ct. 198, 74 L. Ed. 562; Texas & P. R. R. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049.

Plaintiff, to overcome this want of proof, relied upon the proposition advanced in Harris v. St. L. & S. F. Ry. Co. (Mo. App.) 200 S. W. 111, St. Louis-San Francisco Ry. v. Bishop, 182 Ark. 763, 33 S.W.(2d) 383, 384, certiorari denied 283 U. S. 854, 51 S. Ct. 647, 75 L. Ed. 1461, that it must be presumed, in the absence of evidence, that a prudent, careful workman killed on his employer's premises during his hours of work was in the discharge of his duties in a careful and prudent way. She supported this presumption by proof that Cain's hours were from eight to twelve; that the train of cars on track No. 2 which killed him was being made up during those hours; and that he was seen by McMillan, his co-inspector, to go down in that direction with his lantern burning. She argued, too, from the bloodstains on the wheels of 18 cars south of him, and the fact that the first and second of these cars were air coupled, that he must have been coupling the air hose when he was run over and killed. Defendant replies that this is mere speculation, because there was proof that a good many of the other cars were coupled, and proof, too, that when cars were pushed on to an assembling track they were often pushed on already connected. In further, and as it claims, complete rebuttal of plaintiff's claim that Cain was about his duties, it offered the testimony of J. O. McMillan, the only one who knew what Cain's duties were at and about the time he was killed. His duties and hours, from four to twelve, were the same on that day as Cain's. He testified positively and without contradiction that no duties called Cain to the place where he was killed. This testimony is so important that we set it out rather fully.

"After Mr. Cain and I had finished inspecting a local on Track No. 1 leaving about 10:45 that night, I went into the yard office to learn if any trains were ordered. Mr. Cain went in with me into the office, and to the best of my recollection, we talked to the yard clerk, the man who takes care of the bills, and has all the information around the yard office. We asked the yard clerk if a train was called, if there was any train ordered. He said no, there was not. I assume Mr. Cain heard that conversation because we went in together. I went out to the center of the yard and went south. The office to which we reported was also on Seventh Street, and west of the tracks. When we went out of the office we went to Seventh Street, and I went on the same side of the street out about the middle of the yard, and went down. Mr. Cain did not go with me. The last I saw of him he walked out of the middle of the yard a little ahead of me and went north. He had his lantern at the time and I had mine. The inspectors carry lanterns all the time when they are on duty at night. I went down to the shanty south of Seventh Street to take care of my train records. I had no other duty to perform. I do not know why Mr. Cain went up in the top or north yards. He had no business up there that I know of. There was no train called. If one had been called it would have required both Mr. Cain and I to go up there and inspect the train."

"The purpose of shoving a train down to Seventh Street is to connect all of the cars together, and also to put compressed air in the train, and after that is shoved down there is the proper time to hook up the air hose and do the work the inspectors are required to do. That is the custom that has prevailed in that yard since I have been there. It is the custom to do that work after shoving down and connecting the air hose. It would not take me over ten minutes to couple up a train of thirty cars, that is, couple up the air hose. In other words, after this train of cars was shoved down to Seventh Street and connected with air, we could complete the work of inspecting it and coupling the air hose in a very few minutes. The clerk said there was nothing ordered out that night, when I asked him; to the best of my knowledge, the train did not go out until the next morning at 5 o'clock. There was nothing shoved

to Seventh Street on Track No. 2 when I went across there. If a train is not called until 5 o'clock in the morning and an inspector went on duty at 12 o'clock at night he would have that length of time to do what required ten or fifteen minutes to do."

Plaintiff, insisting that she showed sufficiently to go to the jury that Cain was about his duty when killed, admitted the rule in the federal court to be as contended for by defendant, that ordinarily employees working in railroad yards must look out for moving cars, rather than themselves be looked out for by switching crews. Martin v. Wabash R. Co., 325 Mo. 1107, 30 S.W.(2d) 735, 749; Reading Co. v. Haldeman (C. C. A.) 20 F.(2d) 53; Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513; Aerkfetz v. Humphreys, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758; Gilmer v. Yazoo Ry. (C. C. A.) 4 F.(2d) 963; Chesapeake & O. R. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914. She argued, however, that by pleading and proof of the custom of switching crews to watch out for and notify inspectors when cars are to be moved she had brought her case within the exception to the rule. Martin v. Wabash, 325 Mo. 1107, 30 S.W.(2d) at page 749, supra; McGovern v. Philadelphia & Reading, 235 U. S. 389, 35 S. Ct. 127, 59 L. Ed. 283; Director General v. Templin (C. C. A.) 268 F. 483; St. Louis-S. F. Ry. v. Fine, 184 Ark. 940, 44 S.W.(2d) 340, 341. She scouted defendant's claim that Cain was negligent in failing to use blue lights, and, pointing to the evidence that it was practically the universal custom not to use them in the yards, invoked the rule of Reed v. Terminal R. Ass'n of St. Louis (Mo. Sup.) 62 S.W.(2d) 747, as excusing Cain from complying with the rule.

In support of her claim of the custom of switching crews to look out for inspectors, she offered the testimony of two or three witnesses that it slowed the work up unnecessarily to stop the movements of cars for inspections, and that because it did, inspection and work, such as coupling air hose, was customarily done while switching operations were going on. These witnesses testified that under these circumstances, that is, when inspectors were working about moving cars, the members of the switching crew would ordinarily keep a general lookout for them. All of these witnesses swore that no inspector would undertake, to go underneath a standing car or do any substantial repairs on it without making sure the cars would not move, by in some way notifying the switching crew. It was the defendant's claim on this testimony that the whole effect of it was that because it slowed the work up to stop the car movements for ordinary inspection and for coupling air hose, some inspectors would take a chance on doing this work while the cars were moving, instead of doing as they should in prudence do, wait until the movement stopped, and that when the switching crew knew they were engaged in these dangerous practices, they would endeavor, by looking out for them, to minimize the danger. That in short while some of the inspectors would take a chance on inspecting or coupling air hose on the cars while they were moving about the yards without notifying the switching crew, the prudent ones would not do so. The yard superintendent and other witnesses testified that a train such as the one made up on track No. 2 should not be inspected until after its making up had been completed, and that no inspector ought to go on the tracks or between the cars while they were being moved about the yard, until he had by some positive notice insured that no movement would go on while he was there.

The District Judge thought plaintiff had failed to make out a case. He thought both that no negligence proximately causing Cain's death had been shown, and that as to plaintiff's theory that he was working on the cars while they were being moved without giving notice to the train crew relying on them to look out for him, the evidence not only did not warrant his doing so, but made out a case if he did do so of a known dangerous risk, voluntarily assumed by him.

Here by appeal appellant argues, citing the Templin and McGovern Cases, that there was error in peremptorily instructing the jury, for a reasonable view of the evidence which it could have taken is that Cain went down to the cars which he saw standing on the tracks, to inspect them, relying on the custom to warn him. Martin v. Wabash R. Co., supra; Pacheco v. N. Y. R. R. (C. C. A.) 15 F.(2d) 467. She insists that he was just as definitely entitled to rely on this custom to warn as Fine was to rely on Bezdek's promise to warn in the Fine Case, St. Louis & S. F. v. Fine, supra. She urges then that since the proof is absolute that no warning was given, a case was made out for the jury whether or not the custom she relies on was so well proven

that Cain could, in reliance on its being followed, and without being charged with assumption of risk or with being solely responsible for his own death, place himself on the tracks in front of the cars without notifying the switching crew that he was working there.

Appellee argues here, as it did successfully below, that the most the plaintiff's proof comes to was that contrary to the rules of the company, and contrary to the safe and settled practices, some inspectors sometimes recklessly took chances in inspecting cars while they were being moved, instead of waiting until the movements were over; chances so fraught with risk and danger as to convict one who took them of having, as matter of law, assumed their risks, and of having, as matter of law, brought about his own injury solely through his own carelessness. It urges, too, that taking plaintiff's evidence at its best, it proves only that reckless practices were sometimes indulged in in the yards by inspectors, and that if Cain's death occurred as plaintiff infers it did, from his having gotten in between the cars to work there without notifying the crew, the evidence admits of no other verdict than that his own want of care was the sole cause of his injury, his death the result of a risk he had deliberately assumed. It argues, further, that over and above all this it is perfectly clear that plaintiff has not made out a case because there was no proof as to what Cain was doing when he was hurt; all is surmise and speculation. No one knows whether, in violation of what all say were both the rules and the practices, and without any duty to go there, he was undertaking, without giving notice, to make substantial repairs on the cars; whether he was trying to couple the air hose; or whether he was merely attempting to pass between the cars on his way about the yard, having, under the uncontradicted testimony of McMillan, no duties to perform on or about the tracks. We agree with appellee.

We have set the case and the contentions out thus fully not because we have found ourselves in any difficulty in reaching a conclusion about them, but because appellant has been so earnest in pressing upon us that the trial court has erred. A careful examination of the evidence in the light of the rule prevailing in both state and federal courts, that a jury case is made out under the Federal Employers' Liability Act when reasonable minds could draw from the evidence the conclusion that there was negligence of defendant, in law the proximate cause of the injury, Martin v. Wabash, supra; St. Louis & S. F. Ry. v. Fine, supra; Southern Railway v. Wilkens, 95 Ind. App. 130, 178 N. E. 455; St. Louis-San Francisco Ry. v. Bishop, 182 Ark. 763, 33 S.W.(2d) 383, 384; but that it is not made out when such proof is lacking, Shipp v. Boston & M. R. R., 283 Mass. 266, 186 N. E. 653; Pennsylvania R. v. Johnson, 91 Ind. App. 412, 169 N. E. 358; Chicago, M. & St. P. Ry. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041; Chesapeake & O. R. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207, leaves us in no doubt that the District Judge was right, and that his action in instructing a verdict should not be disturbed, Patton v. T. & P. Ry., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361.

The judgment is affirmed.