Lulu B. Martin, Administratrix of Estate of Alexander Martin, v. Wabash Railway Company, Appellant.—30 S. W. (2d) 735.

Division One, July 9, 1930.

1108

*Homer Hall, J. F. Barry* and *Mahan, Mahan & Fuller* for appellant.

*J. O. Allison* and *E. L. Alford* for respondent.

SEDDON, C.—This action was brought by Alexander Martin, now deceased, to recover damages for personal injuries suffered by him on March 8, 1925, while he was employed as a car inspector and repairman in the outer switching-yards of the Wabash Railway Company at Hannibal, Missouri. The action is brought under the provisions of the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59; U. S. Comp. Stat., secs. 8657-8665), resulting in a verdict and judgment for plaintiff, Alexander Martin, in the sum of $16,000. After unsuccessfully moving for a new trial and for arrest of the judgment, the defendant was allowed an appeal to this court from the judgment below. The plaintiff died pending the submission of the appeal, and the action having been revived in the name of the administratrix of decedent's estate, the said administratrix becomes the respondent herein.

The petition avers that both plaintiff and defendant were engaged in interstate commerce at the time of plaintiff's injury, and that plaintiff asserts his right of recovery of damages under the terms and provisions of the Federal Employers' Liability Act; that, on March 8, 1925, and for about two and one-half years prior thereto, plaintiff was in the employ of defendant at the "outer yard," or main switching-yard, of defendant in Hannibal, Missouri, as a car inspector and repairman, and, as such employee, it was the duty of plaintiff to make an inspection of the wheels, brakes, and other parts, of the cars in defendant's freight trains, while such freight trains were in motion and were being pulled into defendant's main or outer switch yard at Hannibal; that about eight

o'clock on the evening of March 8, 1925, while defendant's freight train No. 95 was being pulled into said switch .yard on track No. 1, and while plaintiff was standing between track No. 1 and the main-line track in said yard, and while plaintiff was engaged in his duty of making an inspection of said moving freight train No. 95, plaintiff was struck and injured by defendant's switch-engine No. 591, which was being backed eastwardly upon the main-line track in said switch yard. The petition charges defendant with negligence in the following respects: "That the defendant and; its said agents, servants and employees in charge of said switch engine were careless and negligent in failing and omitting to exercise due care to look out for the safety of the plaintiff, while the plaintiff was engaged in the performance of the usual and ordinary duties of his employment, as aforesaid, and particularly while the plaintiff was engaged in making said partial inspection of the cars of said moving freight train, as aforesaid, and in failing and omitting to so handle said switch engine and to so control its movements, while the plaintiff was so engaged, as to render the plaintiff reasonably free of the danger of being struck by said switch engine, at said time and place; that the defendant and its said agents, servants and employees in charge of said switch engine were careless and negligent in failing and omitting to give the plaintiff due and timely warning of the approach of said switch engine, while the plaintiff was engaged in making said partial inspection of the cars of said moving freight train, as aforesaid, by sounding the whistle or bell of said switch engine, or by some other proper and sufficient signal or warning; that the defendant and its said agents, servants and employees in charge of said switch engine saw, or by the exercise of ordinary care could and should have seen, the plaintiff in his perilous situation, while engaged in making said partial inspection of the cars of said moving freight train, as aforesaid, in time, by the exercise of ordinary care on their part, to have stopped said switchi engine, and thereby to have prevented said switch engine from running against, over and; upon the plaintiff, as aforesaid, and to have prevented the plaintiff from being injured."

The answer denies generally the allegations of the petition, and avers that plaintiff's injury was directly occasioned by his own careless and negligent acts and conduct, and without any negligence on the part of defendant, in that plaintiff, at the time of his injury, was not watchful and careful for his own safety, as was his duty and as the law demanded of him, but that plaintiff negligently placed himself near and about defendant's track and switch engine, and negligently failed to watch for said switch engine; and the answer further avers that, long prior to March 8, 1925, plaintiff was entirely familiar with, and had full knowledge of, the condition and location of all of the tracks in defendant's railroad yard, and particularly the main-

line track and the side-tracks adjacent thereto, and the manner in which engines and trains were there operated, and that plaintiff well knew and appreciated the danger incident to his employment, and especially the danger to him from defendant's switch engines and trains moving over and upon the tracks in said railroad yard, and therefore plaintiff's injury resulted from a risk arising from, and incident to, his contract and employment, and such risk was assumed by plaintiff under the terms of his employment.

The reply specifically denies that plaintiff's injury was in any way caused, or directly contributed to, by any negligence on his part, and specifically denies that the risk from which his injury resulted was incident to his employment, or that he assumed said risk by reason of his employment, but avers that the risk from which his injuries resulted arose out of the negligence of defendant, as specified and set out in the petition, and that plaintiff assumed no risk brought about or occasioned by the negligence of defendant.

It was agreed by the parties, on the trial of the action, that both plaintiff and defendant were engaged in interstate commerce at the time of plaintiff's injury, and that defendant's freight train No. 95 was an interstate train moving from the State of Illinois into and through the State of Missouri, and was carrying merchandise and freight brought from states outside of, and destined to states beyond, the State of Missouri.

The evidence discloses that defendant's outer switch yard in Hannibal consists of a main-line track running east and west for a distance of about one-half mile through the yard, and a number of switch tracks lying north and south of, and parallel to, the main-line track. At the west end of the switch yard was located the yard office, or outer depot, from which place there extended from the main-line track in a northeasterly direction a lead track, from which track switches lead to the several switch tracks lying north of the main-line track. The switch track immediately north of, and adjacent to, the main-line track was known as track No. 1, and the switch track immediately north of track No. 1 was known as track No. 2. In all there were eight switch tracks lying north of, and parallel to, the main-line track, those switch tracks being numbered from 1 to 8, inclusive. A number of switch tracks lay south of the main-line track, and those tracks were used in switching cars and making up trains, and several were used as "rip" or repair tracks, where "heavy" or permanent repairs were made to defendant's cars and equipment. Another lead track was located at the east end of the yard, extending northwestwardly from the main-line track to the several switch tracks lying north of the main-line track.

Defendant's freight train No. 95 was an interstate train, which was operated daily from Springfield, Illinois, and thence westwardly across the State of Missouri to Kansas City, via Hannibal and Moberly.

It usually arrived at the outer switch yard in Hannibal about eight o'clock in the evening of each day. Upon the arrival of train No. 95 at the outer switch yard in Hannibal, the cars of the train were inspected, the engine and the caboose were taken from the train and were replaced with another engine and caboose, and the train crew were changed. After this service was performed, train No. 95 then proceeded west with a new and different engine, caboose and train crew. Train No. 95 usually pulled into the outer yard on switch track No. 1, which was the track lying immediately north of, and adjacent to, the main-line track, the train entering track No. 1 by a switch from the lead track at the east end of the switch yard. Track No. 1 was the longest of the switch tracks in the yard, and accommodated a train of fifty cars. The engine of train No. 95 was usually brought to a stop when it reached the switch leading from the lead track to track No. 1 at the west end of the yard, near the outer depot and yard office, where the engine was detached from the train. The caboose at the rear, or east end, of train No. 95 was detached from the train by a switch-engine, and another caboose was placed on the rear of the train by the switch-engine. The train No. 95 was daily inspected by two inspectors, Alexander Martin and Leslie Hawn. Both inspectors were experienced railroad men, Martin having been in defendant's employ as inspector for a continuous period of two and a half years prior to his injury, and Hawn having been employed as an inspector for a somewhat longer period than Martin. By mutual arrangement, upon the daily arrival of train No. 95, Martin usually took a position on the south side of the incoming and moving train, and Hawn took a position on the north side of the train. The two inspectors were employed on what was known as the "night shift," beginning their work at three o'clock in the afternoon of each day, and working until eleven o'clock at night. Martin testified that he had worked continuously on the night shift for about two years prior to his injury. It was the duty of the two inspectors to examine the wheels, brake rods, brake shoes, underrigging, and drawbars of the cars in defendant's trains. The inspection was commenced while the train was moving into the yard, and was completed while the engine and caboose were being replaced in the train. For the purpose of making such inspection, Martin and Hawn were each furnished a coal-oil lantern, having a shield or reflector which enclosed the light globe on three sides, in order to reflect or throw the light from the lantern forward through the front or open side of the lantern. By the use of such lantern, the light therefrom was projected upon the wheels and underrigging of the cars to aid in the inspection of a train at night.

Earlier in the evening of March 8, 1925, defendant's switch-engine No. 591 had brought a "drag" of cars from the "down-town" or levee yard to the outer yard, and had placed the cars on track No.

2. Having made this switching movement, switch-engine No. 591 proceeded westwardly to the outer yard office or depot, located at the west end of the yard, where it stood on the main-line track for fifteen or twenty minutes awaiting the expected arrival of train No. 95, upon the arrival of which train the switch-engine No. 591 was to proceed to the east end of the yard for the purpose of detaching the caboose from the rear end of train No. 95, and replacing the caboose with another. Switch-engine No. 591 was headed with the front or pilot of the engine toward the west, and with the tender or tank toward the east. The switch-engine was equipped with two electric headlights, one being located on the front or west end of the engine, and the other being located on the top, and at the back, of the tender or tank at the rear or east end of the engine. The candlepower of each electric headlight was 150, which was the usual candlepower of headlights used on switch-engines, and the headlights were so focused as to throw the beams of light outwardly on each side of the track. The evidence is undisputed that both headlights of switch-engine No. 591 were lighted and burning at the time of the arrival of train No. 95 on track No. 1, and that both headlights were lighted and burning at the time of plaintiff's injury. The switch-engine No. 591 was also equipped with an automatic bell-ringer, which is put into operation by means of valves controlled by both the engineer and fireman of the engine, and which automatically rings the engine bell by the power of compressed air. Foot-boards for the use and convenience of switchmen were attached to the front or pilot end of the switch-engine, and also at the rear of the tender or tank.

Upon the arrival of train No. 95 from the east on track No. 1, the plaintiff, Martin, according to his testimony, took a position about ten or fifteen car-lengths (400 to 600 feet) east of the outer depot (which is located at the west end of the yard), and between track No. 1 and the main-line track. The distance between the center of the main-line track and the center of track No. 1 is approximately fourteen feet, and the distance between the inside rails of the two tracks is 9 feet, 4 inches. The ordinary "over-hang" of cars and engines is about 2 feet, 2 inches, outwardly from the rail, so that, when engines and cars are passing upon the main-line track and track No. 1, there is a clear or "free" space, or zone, of at least five feet between the sides of engines and cars while passing on the two tracks; that is to say, the body of a person standing within the "free" space, or zone, of five feet midway between the main-line track and track No. 1 could not be struck by, or come in contact with, the sides of engines and cars passing upon those two tracks. The plaintiff, Martin, testified that he was familiar with the relative location of the different tracks and other facilities in defendant's switch yard.

As train No. 95 approached the west end of track No. 1, the switch-engine No. 591 was backed eastwardly on the main-line track toward the east end of the switch yard, in order to detach the caboose from the rear of train No. 95. Moving eastwardly along the main-line track at a speed of six to eight miles an hour, which was the usual and ordinary speed of switch-engines in defendant's outer yard, and with the tender or tank of the switch-engine headed toward the east, switch-engine No. 591 passed the engine of train No. 95 on track No. 1 about twelve to fifteen car-lengths (480 to 600 feet) east of the outer depot. The bright electric headlight of the engine of train No. 95, the candle-power of which light was 250, momentarily blinded the vision of the engineer of switch-engine No. 591, so that he was unable to see objects clearly or distinctly until a few moments after the engine of train No. 95 had passed. After the engine and two or three cars of train No. 95 had passed, the engineer of the switch-engine suddenly observed a flash of light projected upon the ground at the north or right side of the switch-engine, and, not knowing what caused the sudden flash of light, the engineer applied the emergency brakes and brought the switch-engine No. 591 to a sudden stop. The body of plaintiff Martin was found lying between track No. 1 and the main-line track at a distance of about 60 feet, or an engine length, west of the pilot of engine No. 591. Martin's left leg had been crushed and amputated below the calf of the leg, and he had suffered a fracture of the right arm at the wrist.

The evidence is undisputed that none of the crew of the switch-engine saw Martin at any time before he was struck by the switch-engine, or knew that he was so near the main-line track as to be in danger of being struck by the engine. There is substantial evidence that the crew of the switch-engine knew that train No. 95 was regularly inspected by the inspectors upon its arrival at the outer yard. The engineer and fireman of the switch-engine testified that they were keeping a sharp lookout toward the east as the engine moved backwardly along the main-line track. The positive testimony of the engineer, fireman, and two switchmen of the crew of switch-engine No. 591 was that the engine bell was ringing continuously from the time the switch-engine started to move easterly on the main-line track, and that the engine bell was still ringing when Martin was found lying between the tracks. Similar and corroborative testimony was given by members of the crew of train No. 95. No positive evidence was adduced by plaintiff that the bell of the switch-engine was not ringing at the time of the movement of the switch-engine easterly along the main-line track, although Martin and Hawn both testified that they did not "hear" the bell of the switch-engine; but both testified that train No. 95 was making considerable noise, and that the engine of train No. 95 was working steam and the bell of the latter engine was ringing. Plaintiff's witness, Waelder, who was the fore-

man of the switching crew, testified: "I could not swear that the bell (of the switch-engine) was ringing at the time we were moving down that track, *but I think it was.*" There was no evidence that any rule or custom of defendant required the crew of a switch-engine to give a warning, by bell, whistle, or by a lookout man, of the movement of such an engine in defendant's switch yard. During the backward movement of the switch-engine, the three switchmen of the crew of engine No. 591 were standing on the foot-board at the pilot or west end of the switch-engine, and no member of the switching-crew was stationed as a lookout man upon the east or forward foot-board at the rear of the tender or tank. One of the switching crew testified that "there is not any restriction on the end of the engine to ride on," and that the switchmen used either foot-board of the engine, according to their convenience. The evidence tends to show that the main-line track was usually kept open and clear of cars, and the main-line was the track more frequently used by switch-engines in moving from the west to the east end of the outer yard, although other tracks were occasionally used by switch-engines in moving from one end of the yard to the other end.

Plaintiff Martin testified: "On March 8, 1925, I was working from three in the afternoon to eleven at night. I had put in most service on the three to eleven shift; I judge about two years on this shift. . . . During my two years and a half employment, I became familiar with the location of the tracks, the relative location of the different tracks and other facilities about the switch yards. I was acquainted with the time of arrival of the freight train coming into the yards from the east, known as No. 95. I had inspected that train many times on my watch as it entered the yard. . Usually commenced my inspection of that train at the west end of the yard, while the train was in motion . . . I was making inspection of 95 from the south side; Mr. Hawn was on the north side, and I think about two cars east of me, on the opposite side of the track and train. This was on March 8th, about eight o'clock; it was dark. . . . I was between the main line and track 1. . . . As 95 was pulling into the yard on track 1, and pulling from east to west, I began making my inspection of the train; I was facing northeast; held the lantern in my right hand. I was standing about in this direction, bent over like this (indicating) to watch the tracks, and moved the lantern to and fro backward and forward (indicating) in making this inspection, flashed the lantern on the wheels mostly. I should judge the bottom of the average car is a little over three feet above the rails, or the ground; I don't know exactly how high; I could not make this inspection of the wheels and couplings, and other parts mentioned, by standing close to the moving train, because I could not see under the cars; have to get back so you can see under there. I was facing the northeast, and about in this shape (indicating), when engine No. 591

hit me. It was a switch engine. I had become acquainted with this engine and had seen it about the yards before it hit me. I would say I had inspected something like fifteen cars on No. 95 when the switch engine hit me. No. 95 was still in motion and her engine was working steam when I was hit; the motion of the train was making a noise. There is always considerable noise in working steam through the cylinders of the engine; the exhaust made a loud noise. Q. Did you hear this switch engine, or know of its approach, before it hit you? A. Yes, sir. I had seen it up by the outer depot when I started to inspect; it was standing still. I had seen that when I came back from the rip shanty when I started to inspect the moving train; the switch engine was standing in front of the outer depot. Just before it hit me I didn't know of its approach or hear it; didn't hear any bell on the switch engine; didn't hear its whistle; no man on the switch engine called to me to look out. I didn't hear any signal or warning of the approach of the switch engine. My first notice or knowledge of warning of the switch engine backing down the main-line track was when it hit me. I had my back to it when it hit me. . . . From the time I started to inspect the cars in 95 while in motion, and after I had seen the switch engine standing in front of the outer depot, I had no notice or warning of any kind that the engine had moved from there in front of the outer depot. . . . There is something like five feet left there in which to work when there is a train on both track No. 1 and the main line. I was standing as close to the moving train as I could to inspect it properly; can't stand right up against it, can't see under it; got to stand back to see under it and inspect it. I should judge I was standing, probably, three feet of it. I was standing back from the moving train so I could see under it. Would have to bend over in a stooping position to see under it. While making inspection of the cars on 95, while it was moving, I didn't know I was in danger of being struck by the engine on the main line. *I aimed to be in the clear and to so inspect the train. . . . I aimed to keep clear of the main line. At that time I thought that I was clear of the main line,* I would not be able to say, standing there in the dark, just how far I was either from the main line or the moving train." Cross-examination: *"I aimed to be in the clear of the main-line track that night when I was making that inspection. It was my intention and purpose to get in the clear of that track. I thought I was placing myself so that I was in the clear of that track.* I had no thought that I was placing myself in such a position that I was not in the clear of the main-line track. I had inspected that same train 95 on track 1 numerous times before that night, and we generally did that when 95 was moving towards the west end of track No. 1. I know about how much the overhang was of an ordinary car, or engine, outside of the track. It gave me, as I under-stood it, something like a space of about five feet between the sides of

the cars if there were two trains moving, one on track 1 and one on the main-line track, something like that. Of course, I never measured it; and *I knew, of course, if I got closer than that to the main-line track I would be in danger of being struck,* or if I got closer than that to track No. 1 I would be in danger of being struck. *I had observed that from my past work in the yards there, and in between the two tracks in inspecting that particular train.* . . . I knew engine 591 had got cut off from those cars and had pulled out on the main line up at the outer depot, and the way I saw her was the tank headlight burning, the light from the electric headlight there. . . . I did not necessarily know that when train No. 95 pulled in on track 1 the switch engine had to pull her caboose off the east end and handle other cars that might have to be set out for Hannibal and then set the new caboose on the east end, because a lot of times it worked on the west end; engine from down in town would take the caboose off and put it on. They did not always do that; sometimes; and *I knew that sometimes that engine from the west end would move down to the east end and do that work on train 95. That was not an unusual thing; do it once in a while.* . . . I knew some engine had to do that, but the engine from town could do that, and did that sometimes. I knew that had to be done. I could not tell you whether that engine 591 was the regular engine switching in the outer yards that night, or whether it was the engine from downtown. . . . *I didn't know of any other engine being in that yard at that time that night.* Train No. 95 was a train of merchandise from the east; it would come in and be inspected, and caboose and engine changed, and any cars to be set in or out would be handled in that way, and then it would go on towards the west. That train came in every night, that merchandise train, and it would generally come in on our shift. That was true for two years before the accident happened. . . . I don't remember whether, after I saw engine 591 standing up by the outer depot, I looked again to see about the engine. I hardly think I ever looked back at it; I was watching the train, my attention was called to the train. . . . I am not right positive that I never looked again towards the engine; don't think that I did; don't think I looked back at it. I took a position with my back towards the west where I saw that engine. I guess that I remained with my back in that position until I was struck. *I never turned once my head to look towards the west to see whether engine No. 591 was coming down to take the caboose off that train and put another on.* I was watching while that train pulled by me. My attention was called to the train, doing my duty, inspecting that train as it pulled by me.''

Plaintiff's witness, Waelder, who was foreman of the crew of switch-engine No. 591, testified: ''It was the usual thing, when 95 pulled in on the switch track, No. 1 track, for the switch engine to go down to the east end and switch out the caboose and any other

cars to be switched out, and switch in any cars to be switched in, and switch on a new caboose for the train to go on west. It was handled that way during all the time Mr. Martin was employed in the yard as car inspector. And the switch engine would move down the same line just as it was doing that night, and it was the usual and customary thing for train 95 to pull in on track No. 1 just as it did that night.''

Respecting the blinding of his vision by the light from the electric headlight on the engine of train No. 95, defendant's witness, Bridgman, who was the engineer of switch-engine No. 591, testified: ''They had a very bright headlight on 95's engine; it obstructed my view to a certain extent, blinded me. . . . The effect when an engine switching from the other direction with brilliant headlight burning is that it affects your eyes, kind of blinds you, and you just have to go a distance before your eyesight comes back to normal again. As an engine approaches you, after it passes, you can't see any object that is in front of your engine, or in front of the tender when backing east, as we were that night. . . . When I met the engine on 95, the headlight affected my vision. I could not see any object after that, not an object. I continued to run my engine down the main-line track when I, myself, could not see what was ahead of me or anything about it; I could not have seen anybody in peril; knew I could not see them, and kept on running; didn't occur to me to stop my engine because I could not see them; I didn't stop; I continued to run six or eight miles an hour in that blind period.''

During the examination of plaintiff, Martin, counsel for plaintiff sought to inquire of him ''what was the usual and ordinary custom and practice, during your service there, as to switchmen, or some of the switch crew, riding both ends of the engine while the engine was passing down through the yards on the main line.'' Defendant's counsel objected to this line of inquiry upon the ground that the petition contained no allegation or charge of negligence respecting a violation of any custom or rule by defendant's employees, and that the inquiry was foreign to any charge of negligence (upon the part of defendant or its employees) set up in the petition, and which defendant was called upon to meet. The trial court sustained defendant's objections to the line of inquiry; whereupon counsel for plaintiff offered to prove, by the testimony of plaintiff, that ''during his experience and observation as car inspector for the defendant, it was the usual and ordinary custom and practice of switching crews in the defendant's switch yards at Hannibal, Missouri, to ride both ends of the switch-engine when passing up and down the defendant's main-line track through said yards; that is to say, it was the usual and ordinary practice and custom for at least one of said switching crew to be on each end of said switch-engine under the circumstances mentioned.'' Counsel for defendant objected to the offer of proof, upon the same

grounds as stated in the objection to the inquiry theretofore propounded to the witness, and the trial court sustained the objection and denied the offer of proof.

Peremptory instructions, in the nature of demurrers to the evidence, were requested by defendant at the close of plaintiff's evidence, and at the close of all the evidence. Refusal of the requested peremptory instructions by the trial court is assigned as error by the defendant and appellant.

I. It is strenuously contended by the appellant, Railway Company, that there is no substantial evidence of any actionable negligence on its part, and that the plaintiff, Martin, in placing himself in a position of danger outside the safety zone of approximately five feet midway between the mainline track and track No. 1 of defendant's switch yard, assumed the risk of being struck by the switch-engine moving upon the main-line track, which risk was one that was ordinarily and normally incident to his employment as a car inspector. Appellant therefore urges that it was entitled to a directed verdict in its favor, and that the trial court erred in refusing the requested peremptory instruction directing a verdict for defendant, tendered at the close of all the evidence.

As the instant action is brought under the Federal Employers' Liability Act, the rights and obligations of the parties are to be determined by the provisions of that act, and by the applicable principles of the common law as interpreted and applied in the Federal courts. [Second Employers' Liability Cases, 223 U. S. 1, 55; Seaboard Air Line Railway v. Horton, 233 U. S. 492, 501; Southern Railway Co. v. Gray, 241 U. S. 333, 339; Chicago, M. & St. P. Railway Co. v. Coogan, 271 U. S. 472, 474; Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165, 168; Quigley v. Hines, 291 Mo. 23, 33; Hoch v. Railway Co., 315 Mo. 1199, 1209.] The Federal Employers' Liability Act permits a recovery upon the basis of negligence only, and therefore the burden is on plaintiff to adduce reasonable and substantial evidence to show a breach of duty owed by defendant to him in respect of the place of his injury, and that, in whole or in part, his injuries resulted proximately and directly therefrom. [Delaware L. & W. Railroad Co. v. Koske, 279 U. S. 7, 11; Toledo, St. L. & W. Railroad Co. v. Allen, 276 U. S. 165, 169; Seaboard Air Line v. Horton, 233 U. S. 492, 501; Southern Railway Co. v. Gray Co., 241 U. S. 333, 339.] In cases arising under the Federal Employers' Liability Act, the Federal courts hold that an employee, in entering upon a contract of employment, assumes all the risks and dangers ordinarily incident to his employment, and also the extraordinary risks caused by the employer's negligence which are obvious and

fully known to the employee and appreciated by him, or so plainly observable that he must be presumed to know them. [Boldt v. Pennsylvania Railroad Co., 245 U. S. 441, 445; Toledo, St. L. & W. Railroad Co. v. Allen, 276 U. S. 165, 169; Delaware, L. & W. Railroad Co. v. Koske, 279 U. S. 7, 11; McIntyre v. Railway Co., 286 Mo. 234, 256; Osborn v. Railway Co. (Mo. Sup.), 1 S. W. (2d) 181, 188.]

Appellant insists that the evidentiary facts and circumstances in the instant case bring the action within, and therefore the action must be ruled in accordance with, the principles of the common law as interpreted and applied by the United States Supreme Court in the recent case of Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165. The Allen case went to the Federal Supreme Court on certiorari to the Supreme Court of Missouri. Division Two of this court had unanimously affirmed a judgment rendered in favor of the employee, Allen, in an action brought under the Federal Employers' Liability Act (Allen v. Ross, 292 S. W. 732), and on certiorari the Federal Supreme Court reversed the judgment of our Supreme Court. The evidentiary facts and circumstances in the Allen case are set out at considerable length in the opinion of Division Two of this court (292 S. W. l. c. 733, 734). Epitomized, the facts were these: Allen had been employed by the defendant railroad company for about eighteen months as a car checker in the switching yards of the railroad company at Madison, Illinois. His duties were to check the cars in defendant's freight trains, note the numbers and initials of cars, and write out a train sheet preparatory to the leaving of the freight trains. He worked at night, from eleven P. M. to seven A. M. At the time of his injury, which occurred about 1:15 A. M., he was standing between two parallel tracks, No. 4 and 5, in defendant's switch-yard, engaged in checking the cars in a freight train on track 5, and was standing about three feet back and north from the train. The parallel tracks extended east and west, track No. 4 being the north track, and track No. 5 being the south track. Allen faced the south, and carried a lighted lantern on his left arm and shoulder. Track 4 was clear of cars when Allen began to check the train on track 5, and he believed that the switching of cars in the yard had been done, and was not informed that there would be other switching done in the yard before the departure of the train which he was checking. While so engaged in his duties of checking the several cars of the train on track 5, two cinder cars were shunted west on the adjacent and parallel track 4 by a switching crew and engine, without any warning being given to Allen of the switching movement. Allen was struck by the forward cinder car, run over and seriously injured. There was no lookout man or light on

either of the cinder cars. The clearance, or safety zone, between the sides of the cars Allen was checking on track 5 and the sides of the cinder cars on track 4 was about two feet, nine inches, without considering the grabirons on the cinder cars, which projected 4½ inches. The switchyard was not lighted. It was customary to ring the engine bell when the switching engine was about to be moved, if anyone was working nearby. It was also customary, when Allen was engaged in checking cars, for passing switchmen to tell him if cars were to be switched by the place where he was working. The foreman of the switching crew was present in the office of the yardmaster when Allen was directed by the yardmaster to check the cars on track 5, and the foreman, at the time of the switching movement, knew that Allen was engaged in his duties between tracks 4 and 5; in fact, the foreman of the switching crew saw Allen (or a person he believed to be Allen) at a distance of 100 or 125 yards, with his lantern, engaged in checking the train on track 5, when the foreman cut loose the two cinder cars and shunted them west on track 4 at a speed of four to six miles per hour. The switching foreman, from his position, could have called to Allen, but did not do so, because the foreman did not think that Allen was in danger from the shunted cars on track 4. It was uncontroverted that no signal or warning of the switching movement was given by bell, whistle, or otherwise. The shunted cars made little, if any, noise, and were not seen or heard by Allen, whose attention was directed to the checking of the train on track 5. There was testimony that Allen's duties took him into all parts of the yards, where he knew the switch-engine crew would be switching cars, but, ordinarily, trains would be made up before Allen would go out to check them; and rarely ever would another train be made up on an adjacent track while he was engaged in checking a train. No member of the switching crew, except the foreman, actually saw Allen in the yard, or knew that he was engaged in checking the train on track 5, at the time the cinder cars were shunted onto track 4, or knew that such movement would be attended with risk or danger to him. The cause was tried and submitted by the plaintiff, Allen, upon the theory that the defendant railroad company knew that it was necessary for Allen, in the performance of his duties of checking the train on track 5, to face toward the cars on track 5, with his back to track 4, and, therefore, that it became the duty and obligation of defendant railroad company, and its employees in the switching crew, to warn Allen by bell, whistle, or other signal, or by a lookout man on the moving cinder cars, none of which precautions were taken by defendant's switching crew, and that the failure to take such precautions and to give such warning to Allen constituted actionable negligence on defendant's part. The position and theory of

defendant was that there was no actionable negligence on its part, and that the plaintiff Allen assumed all the risks incident to the movement of the cars in the switch-yard, and that it was his duty under the law to look out for his own safety; wherefore, the defendant urged that it was entitled to a directed verdict. Said Division Two of this court, in denying defendant's contention that it was entitled to a directed verdict (292 S. W. l. c. 736, 737): "There was ample evidence from which the jury could find that the dangers to which plaintiff (Allen) was exposed were dangers created by appellant and which were or should have been fully known by the appellant's switch foreman and were unknown to plaintiff and not plainly or obviously perceptible to his observation. There is really no controversy about the facts, the contention being that it was not customary to warn a car checker of the movement of cars in the switch-yard; that plaintiff was required to look after his own safety; that he assumed the risk of being struck by the cinder cars; and that on the evidence the court should have directed a verdict for the defendant. The fallacy of this contention is that, by shunting the cinder cars in the nighttime onto the track where it was known that plaintiff was working, without a light or a man on the cars and without warning of any kind, appellant created an unusual hazard. If it be true, as contended by appellant, that, according to the practice in defendant's yard, cars could be shunted dangerously near to the place where plaintiff was working, without any warning to him or knowledge of such custom or practice on his part, then the system of doing the work was not reasonably safe, and plaintiff was not provided with a reasonably safe place in which to work, and he did not assume the risk. . . . The demurrer to the evidence was properly overruled."

In reversing the ruling and judgment of this court in the Allen case, the Federal Supreme Court announced, in a unanimous opinion of that court, delivered by Mr. Justice BUTLER (276 U. S. l. c. 168 et seq.): "The Act of Congress under which plaintiff seeks recovery took possession of the field of liability of carriers by railway for injuries sustained by their employees while engaged in interstate commerce, and superseded state laws upon that subject. [Second Employers' Liability Cases, 223 U. S. 1, 55.] This case is governed by that act and the principles of the common law as applied in the courts of the United States. The plaintiff cannot recover in the absence of negligence on the part of defendant. [Seaboard Air Line v. Horton, 233 U. S. 492, 502.] And, except as specified in Section 4 of the act, the employee assumes the ordinary risks of his employment and, when obvious or fully known and appreciated by him, the extraordinary risks and those due to negligence of his employer and fellow employees. [Boldt v. Pennsylvania R. R. Co., 245 U. S. 441, 445; Chesapeake & Ohio Ry.

v. Nixon, 271 U. S. 218.] If, upon an examination of the record, it is found that as a matter of law the evidence is not sufficient to sustain the essential findings of fact, the judgment will be reversed. [C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 474.] . . . The court authorized the jury to find defendant negligent in failing to cause the engine bell to be rung and in sending the cars along track 4 without a light and unattended. The opinion below declares that the starting or running of the switch engine without ringing a bell or blowing a whistle was evidence of negligence; and that if, according to the practice, cars could be shunted dangerously near to the place where plaintiff was working, without any warning to him or 'knowledge of such custom or practice on his part,' the system of doing the work was not reasonably safe and plaintiff was not provided with a reasonably safe place in which to work, and did not assume the risk. . . . The decision on this point is contrary to the rule followed in the Federal courts. Aerkfetz v. Humphreys, 145 U. S. 418, was a case presenting a situation similar to that here involved. It is there said (p. 420): 'The ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion.' And see Rosney v. Erie R. Co., 135 Fed. 311, 315; Connelley v. Pennsylvania R. Co., 201 Fed. 54, 57. And there is no support for the assumption that plaintiff was without knowledge of the switching practice followed in that yard or that the movement in question created an unusual hazard. On the evidence it must be held that he knew how switching was done there; and, in the absence of proof that he was exposed to some unusual danger by reason of a departure from the practice generally followed, it cannot be held that defendant was in duty bound to give him warning. The members of the switching crew had a right to believe that he would keep out of the way of the shunted car. [Aerkfetz v. Humphreys, supra.] In any event plaintiff assumed the risk. He was familiar with the yard and the width of the space between the tracks and knew that cars were liable to be shunted without warning to him. The dangers were obvious and must have been fully known and appreciated by him (citing authorities). . . . There is nothing to sustain a finding that plaintiff was in any danger other than such as was usually incident to his employment or that any member of the crew knew or had any reason to believe that he was oblivious of the situation. [Illinois Central Railroad Co. v. Ackerman, 144 Fed. 959, 962.] In the absence of knowledge on their part that he was in a place where he was liable to be struck and oblivious of that danger, they were not required to vary the switching practice customarily followed in that yard or to warn or to take other steps to protect him.''

In Aerkfetz v. Humphreys, 145 U. S. 418, 420, which case is approvingly cited and followed by the Federal Supreme Court in the Allen case, supra, plaintiff was employed in the switch-yard of defendant railroad company as a track repairman, and sought recovery of damages for injuries suffered when, while engaged in his duties and standing with his back to an approaching car, he was struck and run over by a freight car moved by a switch-engine, at a slow and customary rate of speed, along one of the tracks in defendant's switch-yard. Defendant pleaded that it was guilty of no actionable negligence respecting any duty it owed to plaintiff. In affirming a judgment for defendant, the court, speaking through Mr. Justice BREWER, said: ''What negligence can be attributed to the parties in control of the train or the management of the yard? They could not have moved the cars at any slower rate of speed. They were not bound to assume that any employee, familiar with the manner of doing business, would be wholly indifferent to the going and coming of the cars. There were no strangers whose presence was to be guarded against. The ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion. The person in direct charge had a right to act on the belief that the various employees in the yard, familiar with the continuously recurring movement of the cars, would take reasonable precaution against their approach. The engine was moving slowly, so slowly that any ordinary attention on the part of the plaintiff to that which he knew was a part of the constant business of the yard would have made him aware of the approach of the cars, and enabled him to step one side as they moved along the track. It cannot be that, under these circumstances, the defendants were compelled to send some man in front of the cars for the mere sake of giving notice to employees who had all the time knowledge of what was to be expected. We see in the facts as disclosed no negligence on the part of the defendants, . . .''

The Aerkfetz case, supra, has been quoted with approval, and the principle of law announced therein has been followed by this court, in Cahill v. Railway Co., 205 Mo. 393, 408; Gabal v. Railroad Co., 251 Mo. 257, 267; and Bruce v. Railroad Co., 271 S. W. 762, 765.

In Reading Co. v. Haldeman, 20 Fed. (2d) 53, 55, a case recently ruled by the Federal Court of Appeals, Third Circuit, recovery of damages was sought for the death of a yard employee, who was killed by stepping in front of the tender of an engine which was being backed, without warning, and without a lookout man on the tender, along a switch track in defendant's switch-yard, where the deceased had been employed for a number of years, his duties being to oil, inspect, and make light repairs. Said that court,

in reversing a judgment in favor of the plaintiff, the administratrix of decedent's estate: "It will thus be seen that the work on which the decedent was engaged was one of peril; that the noise incident to escaping steam in such yards, the uncertain movement of engines, the fact that no system of warnings has been, or indeed could be, devised by which danger could be avoided, have made this court hold to the reasonable rule that, as said by it in Connelley v. Pennsylvania Railroad, 201 Fed. 54 (cited by Supreme Court in Chesapeake v. Nixon, 271 U. S. 218 . . .), 'from the nature of such employment, the duty of self-preservation has to rest on them, for no adequate protection, other than self-protection, can be afforded them. And such has been the reasonable holding of the law.' Seeing, then, that no negligence has been shown on the part of the railroad in failing to have a warning system, and in view of the evidence shown by the plaintiff's case that the deceased stepped on the coal dock track immediately in front of an engine coming on a track where, if he had looked, he could have seen its approach for 400 or 500 feet, we are constrained to hold (that) the court should have given binding instructions for the defendant."

In Norfolk & W. Ry. Co. v. Collingsworth (C. C. A., 6th Circuit), 32 Fed. (2d) 561, the appellee, Collingsworth, while engaged in his duties as a switch-oiler in the switch yards of appellant railway company, was run down and injured, after dark on October 15, 1926, by the forward end of a cut of eleven or twelve box cars, which were being shoved by a switch-engine moving backwardly along a main-line track in the switch-yard, the switch of which track appellee was engaged in oiling. Appellee sued under the Federal Employers' Liability Act to recover damages for the injuries inflicted. Appellant's motion for a directed verdict below was denied, and the trial court submitted the case to a jury upon two allegations of negligence: first, that "the train was moving eastwardly without having a watchman or lookout on the leading car, and without maintaining a light on the forward end of the train, and without giving any warning signal or notice of the train's approach;" and, second, that "the crew by the exercise of ordinary care should have known of the presence of the plaintiff on the track and thus avoided the injury." Said the Federal Court of Appeals, in reversing the judgment below, 32 Fed. (2d) l. c. 562, 563: "We believe the motion for a directed verdict should have been sustained. The suit was brought under and falls within the Federal Employers' Liability Act. This act permits a recovery only upon proof of negligence, and we believe that there was no evidence of any lack of due care upon the part of appellant touching any duty it owed to appellee. Appellee's duty was to oil twenty-eight switches. He oiled each switch about three times daily. . . . Appellee admits that he knew his posi-

tion was dangerous. It was particularly dangerous, in that it was at a switch on the main line. He admits that it was his duty to watch for the trains and to look out for himself; that he knew that the west-bound main track was used in making up and shifting cars in the yard, and that the crew of the train that injured him was a yard crew, and that the cut of cars was ahead of the engine; that he knew that the crew was working in the yards that night, and that this crew was not running any main-line trains. He, of course, also knew that this crew with the engine and cars was out on the main line, and must necessarily return to a side track either over the switch at which he was working or at some other point. He had oiled these 28 switches, including the particular one at which he was injured, daily, since May 17th, working from two P. M. until ten P. M. We conclude, therefore, that the case falls within Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165 (and other cases cited).

"Under these conditions, the proof fails to warrant a finding of negligence against the appellant. It had a right to assume that appellee would look out for himself. The risk was hazardous, but it was, after all, only that ordinarily and normally incident to his job."

The respondent administratrix herein, in urging an affirmance of the judgment below, places chief reliance upon the rulings of the Federal courts as announced in Chesapeake & Ohio Ry. Co. v. Proffitt, 241 U. S. 462; Chesapeake & Ohio Ry. Co. v. De Atley, 241 U. S. 310; and Southern Railway Co. v. Smith, 205 Fed. 360. An analysis of the cited cases convinces us that they are clearly distinguishable, upon the controlling facts, from the case at bar, and that they have no application to the precise question involved herein. In the Proffitt case, supra, plaintiff, who was a head brakeman in a train crew about to leave a railroad yard on a road trip with a train of cars which had been made up and attached to a road engine, was directed by the yardmaster to "cut out three cars at the head end of the train and switch them off on a track and come back and couple up, and they would be ready to go." Plaintiff proceeded with the road engine to take out the three cars, as directed by the yardmaster, and returned to the main track with the road engine, coupled the latter to the forward end of the train, and was in the act of coupling up the air-hose, an operation that necessarily required him to step between the rails of the track, when a yard or switching crew, who were also acting under orders from the same yardmaster, with the aid of a switch-engine drove a cut of 29 cars into the rear of the standing train without warning, and with such undue violence as to throw the standing train, and the road engine attached to the front thereof, forward twenty feet along

the track. Plaintiff was knocked down by reason of the violent impact, run over by the train, and sustained serious injury. There was evidence that it was customary for the train to be "worked" at both ends, the road crew operating at the front end, and the yard crew operating at the rear end of the train, but plaintiff denied that he was familiar with the custom, and it appeared that he had not theretofore been a member of the road crew of the particular train in question. Both the road crew and the yard crew were working at the time under the immediate orders and direction of the same yardmaster, who did not inform plaintiff that the yard crew were working at the rear of the train, and plaintiff had no notice that anything was to be done at the rear end of the train beyond merely attaching the caboose. Under such facts, it was held that plaintiff did not assume the extraordinary risk attributable to the plain and palpable negligence of the master in the premises. In the De Atley case, supra, plaintiff, who was acting as head brakeman on an interstate freight train, was directed by the engineer of the train to leave the train and go forward to a signal tower and inquire of the operator whether it was safe to move the train forward on its journey along the main line. Plaintiff went to the tower and received the information from the operator that it was safe to proceed with his train, and, upon descending to the platform in front of the tower and beside the main track, he saw his train approaching. When the engine of the train approached the platform, he attempted to board the moving engine, but the speed of the train was such that he slipped and fell between the wheels of the tender and was seriously injured. The train was moving at a speed of twelve miles an hour when plaintiff attempted to board the engine, and he was unable to accurately judge its speed from his position on the platform. Held, that plaintiff did not assume the extraordinary risk arising from the negligent failure of the engineer to use due care to operate the train at a moderate rate of speed, so as to enable plaintiff to board the engine without undue peril. In the Smith case, supra, the plaintiff's intestate, who was employed as a switch-tender in defendant's railroad yards, was walking along a track in the yards at night, with his back to an approaching engine, when he was overtaken and killed by the engine, which was "drifting" or moving slowly behind him on the track, making very little noise. While the appellate court, in that case, remarked that "plaintiff's proof is not far beyond the margin line of insufficiency," yet the court found that there was sufficient evidence to give support to the theory that the engineer was inattentive to his duty, and was not looking along the track ahead of his slowly moving engine, otherwise he could undoubtedly have seen the decedent walking along the track eighty to one hundred feet ahead of the engine, and that the engineer could

have stopped the slowly moving engine in ten feet, or could have given a probably effective warning to decedent. The opinion in the case does not give space to a relation or discussion of the evidence, although the opinion seemingly measured the breach of duty on the part of the engineer by the peculiar circumstances of that case.

Respondent herein lays stress upon the testimony of the engineer of the switch-engine that his vision was blinded by the glare of the electric headlight on the front of the engine of train No. 95, and that he was unable to see any object ahead of the backing switch-engine until after the engine of train No. 95 had passed the switch-engine. Respondent seemingly takes the position that it was negligence on the part of the engineer to have continued to move the switch-engine along the main-line track under such circumstance, and that the movement of the switch-engine should have been stopped when the engineer knew that his vision was blinded. Counsel for respondent cite no judicial authority in support of such position, and research on our part discovers none. So far as the evidence discloses, the engineer of the switch-engine had the reasonable right to anticipate that the main-line track was clear, when he started to move the switch-engine from the west to the east side of the yard, and it is unquestioned that the switch-engine was being moved at the usual and reasonably slow speed of only six to eight miles per hour. We cannot say that the law imposed upon the engineer the positive duty or obligation to stop the movement of the switch-engine while he was momentarily blinded by the glare of the headlight on the engine of the oppositely moving train. The imposition of such a duty, we think, would unreasonably and impractically hamper and retard the efficient movement of engines and trains in the switch-yard.

It is argued by respondent that the duties of Martin in inspecting the moving train No. 95 were of such peculiar and engrossing character as not to permit of his looking backward, or about him, in order to see whether he was in danger from an approaching engine; and, therefore, it is claimed that the defendant and its employees in control of the moving switch-engine owed to Martin a higher or greater duty to watch out for his safety, and to warn him of the approach of the switch-engine, than they owed to a mere section-man, switch-oiler. track-walker, or car checker, whose duties are such that those classes of yard employees are free, at any time, to look up from their work and ascertain whether they are in danger. . As we read and analyze the decisions and rulings of the Federal courts, they make no distinction between classes of yard employees, and they impose no greater duty or obligation upon the railway employer toward a car inspector than toward any other yard employee, whether he be a section-man,

switch-oiler, trackman, or car checker. The Federal courts seemingly adhere to and apply the principle of the common law that yard employees, regardless of their class and the character of their work, and regardless of their precise and particular duties, must themselves look out for their own safety, and that switching or engine crews are under no duty or obligation, while engaged in yard movements, to watch out for the safety of yard employees, or to warn them, unless actually seen to be in immediate peril and oblivious thereof. [Toledo, St. L. & W. R. R. Co. v. Allen, 276 U. S. 165, 173; Chesapeake & Ohio Ry. Co. v. Nixon, 271 U. S. 218, 219; Aerkfetz v. Humphreys, 145 U. S. 418, 420; Connelley v. Pennsylvania Railroad Co., 201 Fed. 54, 56; Reading Co. v. Haldeman, 20 Fed. (2d) 53, 55; Pennsylvania Railroad Co. v. Lutton, 29 Fed. (2d) 689, 690; Norfolk & W. Ry. Co. v. Collingsworth, 32 Fed. (2d) 561, 563; Gilmer v. Railroad Co., 4 Fed. (2d) 963.]

The evidence herein discloses that Martin was an experienced railroad yardman; that, according to his own testimony, he had worked in defendant's switching yard on the night shift continuously for two years prior to his injury; that he had inspected the train No. 95 daily, and at about the same time in the evening, during the whole of such period of two years; that he knew that the engine and caboose of train No. 95 were removed upon the daily arrival of that train in the outer yard, and that the removal of the caboose from train No. 95 necessitated the use of a switch-engine; that it was not an unusual occurrence, upon the arrival of train No. 95, for the switch-engine to move down the main-line track from the west to the east end of the yard; that he saw the switch-engine, on the night of his injury, with its electric headlight burning, standing upon the main-line track in front of the outer depot at the west end of the yard, upon the arrival of train No. 95, when he took a position between track No. 1 and the main-line track for the purpose of inspecting that train; that he "didn't know of any other switch-engine being in the yard at that time that night;" that he "never once turned his head to look toward the west to see whether switch-engine No. 591 was coming down the main-line track to take the caboose off train No. 95;" that he was familiar with the relative location of the tracks in the switch-yard, and the width of the space between the tracks, and knew that the safety zone between the sides of cars and engines passing on track 1 and the main-line track was about five feet; that he knew if any part of his body protruded beyond the safety zone of five feet he would be in danger of being struck by an engine or train moving on the main-line track; that he knew and appreciated the danger of getting outside of the safety zone of five feet; and, appreciating the danger, on the night of his injury, he

"aimed to be in the clear of the main-line track that night when making that inspection." There is not a scintilla of evidence in the record that the switching crew had given Martin any other or different warning of the movement of the switch-engine upon any prior occasion, or at any previous time, than was given on the night of his injury. The evidence is undisputed that the electric headlight was lighted and burning on the forward end of the tank or tender of the switch-engine as it moved eastwardly on the main-line track, and the evidence is that the beam of the headlight was projected some distance ahead of the backing switch-engine, and on both sides of the main-line track. All of the positive evidence is to the effect that the bell of the switch-engine was ringing continuously as the engine moved easterly along the main-line track; although there is some testimony, of a purely negative character, however, by the inspectors Martin and Hawn that they did not "hear" the bell of the switch-engine, which failure to "hear" the bell may have been, and doubtless was, because of the noise of train No. 95 and the ringing of the engine-bell of that train. As we view the evidence, there is an absence of any reasonable or substantial proof that Martin was exposed to any risk or danger other than that which was ordinarily incident to his work and employment, by reason of the manner of the movement and operation of the switch-engine upon the night of his injury; or is there any substantial proof of a departure (upon the night of plaintiff's injury) from the switching practice and operations generally followed in defendant's switch-yard.

Upon all the facts and circumstances in evidence, we are of opinion that the instant case must be ruled in accordance with the principles of the common law as applied and announced by the Federal Supreme Court in Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165, the evidentiary facts in which case bear striking similarity to the facts in the case at bar. Applying the Federal rule (as this court is bound to do in cases arising under the Federal Employers' Act), we are constrained to hold that the evidence herein is insufficient to convict the defendant-appellant of any actionable negligence touching any duty it owed to the deceased plaintiff Martin in the premises, and that the risk encountered by Martin was one that was ordinarily and normally incident to his employment, which risk he assumed, and which is a bar to a recovery for his injury under the Federal Employers' Liability Act. [Hoch v. Railway Co., 315 Mo. l. c. 1209, and Federal decisions there cited.] The trial court, therefore, should have directed the jury to return a verdict for defendant, as requested in the peremptory instruction tendered at the close of all the evidence.

II. It appears from the record herein, however, that plaintiff's counsel sought to inquire of plaintiff, on the trial below, "what was the usual and ordinary custom, during your service there, as to switchmen, or some of the switch crew, riding both ends of the engine while the engine was passing down through the yards on the main line;" and that defendant objected to such inquiry upon the ground that no such custom, practice, or rule, was pleaded in the petition, and that the petition did not charge defendant with a breach of duty toward plaintiff in the violation of any custom, practice, or rule. The trial court sustained defendant's objections to the inquiry, and counsel thereupon offered to prove, by the testimony of plaintiff, that "during his experience and observation as car inspector for the defendant, it was the usual and ordinary custom and practice of switching crews in the defendant's switch yards at Hannibal, Missouri, to ride both ends of the switch-engine when passing up and down the defendant's main-line track through said yards, . . . (and) for at least one of said switching crew to be on each end of said switch-engine under the circumstances mentioned." Defendant objected to the offer of proof, upon the ground and for the reason aforestated, and the trial court denied plaintiff's offer of proof. By such rulings of the trial court, the plaintiff was denied the opportunity of offering proof of a custom or practice (if any such there was), in defendant's switch yard, for at least one member of the switching crew to take a position and ride at each end of the switch-engine, while moving on the main-line track. No such custom or practice was alleged in the petition, and no breach of duty toward plaintiff was charged in the petition respecting a violation of any custom, practice, or rule, by defendant and its employees in charge of the movement and operation of the switch-engine. The petition, and plaintiff's main instruction herein, were predicated upon the theory of negligence on the part of defendant, and its employees in charge of said switch-engine, in failing to exercise ordinary care to look out for the safety of plaintiff and render him reasonably free of the danger of being struck by said switch-engine, and in failing to give plaintiff any warning of the approach of said switch-engine. In other words, the petition, by its allegations, sought to charge defendant with such negligence only as is prescribed by the general rules of the common law. The custom or practice aforesaid, if the same had been allowed to be shown in evidence on the trial, would have taken the case out of the general rules of law, and would have required the defendant to defend against the violation of a duty, arising wholly out of a local custom, usage, or practice, which is not imposed by the general rules of the law.

In Kirkland v. Bixby, 282 Mo. 462, plaintiff's intestate, a section-foreman, was killed in the collision of a hand-car (on which he was

riding to his work) and one of defendants' trains. The collision occurred in a fog, and the negligence charged in the petition was "that defendants by their employees in charge of said train . . . were further negligent and careless in failing to ring the bell and sound the whistle at such frequent intervals, while running through *the fog,* as would warn the crew on the hand-car of the approach of said train. . . ." The answer was a general denial, with pleas of contributory negligence and assumption of risk. Said this Division of our court, in passing upon the admissibility (under the allegations of the petition) of evidence received on the trial tending to show that there was a custom of long standing upon defendant's railroad as to the sounding of the bell and the blowing of the whistle at frequent intervals, when the weather was foggy, for the purpose of warning section men of approaching trains (l. c. 468 et seq.): "A full reading of the petition and the evidence shows that plaintiff failed in the case, save and except a proven custom existed to give warning during foggy weather. The question then is, was this custom pleaded, and the evidence thereof competent. The general rule is that warnings to section men are not required. We have quoted all that is said about the fog in the petition. There is no allegation as to a custom to give warning during foggy weather. . . . The petition should charge a duty and its violation in order to show liability. If the violation of a duty arises from the failure to observe a custom of long standing, the custom should be pleaded so as to clearly point out the duty. In other words, if the duty arises from a custom, or usage, the custom or usage should be pleaded, and if not pleaded no evidence of a custom is admissible. This petition should not only have pleaded this local custom or usage, but should have averred that deceased had knowledge of it. [12 Cyc. 1097 et seq.] As to section men the general rule of law is that they must look out for their own safety, and no warnings are required to be given them. If this general rule of law is to be changed by a local or particular usage or custom, this custom or usage must be pleaded. In Hayden v. Grillo's Admr., 42 Mo. App. l. c. 5, THOMPSON, J., said: 'It is necessary to plead a special custom, where such a custom is relied upon, to take a case out of the general rules of the law.' . . . The reason of the thing is with the practice that the local usage should be pleaded, if such local usage is relied upon to take the case out of the usual rules of law. In the instant case the local usage or custom was relied upon to take plaintiff's case out of the general rule of law. That local usage or custom was to the effect that in foggy weather along the Missouri River bottoms, on this (rail-) road, the trainmen gave section men warning by ringing the bell and sounding the whistle at frequent intervals. This local usage or custom, if pleaded and proven, would

take the case out of the general rule. Fairness demands that such usage and custom be pleaded. It is not pleaded in this case, and all that evidence tending to show such usage and custom should not have been admitted under the present petition.'' To like effect was our ruling in Nivert v. Railroad Co., 232 Mo. l. c. 639, 640, 641.

In the present case, we are inclined to the view that the custom or practice sought to be shown by the testimony of plaintiff was substantive matter, and was not merely evidential of a lack of ordinary care on defendant's part, as ordinary care is measured and prescribed by the general rules of the law. Therefore, the proffered testimony of plaintiff, tending to show the existence of the local custom or practice, was properly denied by the trial court, for the reason that the existence of the custom or practice, and a violation thereof, were not pleaded in the petition as a substantive ground of defendant's liability.

The immediate question, then, is whether the judgment of the circuit court herein shall be reversed outright, without remanding the cause for retrial, or whether the judgment shall be reversed and the cause remanded to the circuit court, in order that the respondent administratrix may amend the petition, so as to plead the local usage and custom (if such there was) whereof proof was tendered and denied on the trial below. There may have existed, prior to Martin's injury, an established and recognized custom or practice in defendant's outer switching yard at Hannibal, Missouri, for at least one of the members of a switching crew to ride, or take a position upon, the forward foot-board of a moving switch-engine, while operating in said yard, which custom or practice may have arisen, or may have been established by defendant and its switching crews, for the benefit, safety and protection of car inspectors and other yard employees, while engaged in their duties in said yard. A number of recent decisions of several of the Federal Circuit Courts of Appeals, in actions brought under the Federal Employers' Liability Act, have seemingly created an exception to the general rule or doctrine of law applied in the Aerkfetz and kindred cases, supra, the exception being that, where a plaintiff's suit or action, seeking a recovery under the Federal Employers' Liability Act, is grounded upon a pleaded rule, custom, or practice, alleged to have been established by the railroad employer for the benefit and protection of the class of employees to which plaintiff belonged at the time of his injury, plaintiff is entitled to a recovery upon substantial proof of the existence and establishment of such rule, custom, or practice, and upon substantial proof that plaintiff's injury was caused by, or resulted from, a violation of, or failure to observe, such established rule, custom, or practice, on the part of the railroad employer and its employees, while plaintiff was working in the line of his duties.

[Pacheco v. New York, N. H. & H. Rd. Co. (C. C. A.), 15 Fed. (2d) 467, 468, and cases there cited.] In such exceptional instances, it has been held that railroad employees for whose benefit and protection the rule, custom or practice is shown to have been established, while working in the line of their duties, have the right to rely upon the observance of such established rule, custom or practice; and a violation thereof, by the railroad employer or its employees, takes the case out of the general rule of law, as announced in the Aerkfetz and kindred cases, supra, which general rule is to the effect that a railroad company owes no duty or obligation toward employees working in its yards, or near and about its tracks, to sound a bell or whistle, or to station a lookout man, so as to warn such employees of the approach of switch-engines or cars moving thereabout. [Chesapeake & Ohio Ry. Co. v. Mihas, 280 U. S. 102, 74 L. Ed. 92; Pacheco v. N. Y., N. H. & H. Rd. Co., 15 Fed. (2d) 467; O'Donnell v. Balt. & Ohio Rd. Co. (Mo. Div. 1), 26 S. W. (2d) 929.]

In view of the apparent exception to the general rule, as announced in the cases last cited, we conclude that the instant cause should be remanded to the circuit court, in order that the administratrix of the deceased plaintiff's estate may amend the petition (if she be so advised) so as to plead the establishment and the violation of the custom or practice (if such there be), relied upon to take the case out of the general rule of law applied in the decisions of the courts of the United States, and in order that the administratrix (if able so to do) may offer substantial proof of the establishment and violation of such custom or practice.

The judgment *nisi* is therefore reversed, and the cause is remanded to the circuit court. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.